IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, an adult individual seeking to proceed anonymously, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | CASE NO.: 2:21-CV-111 |
| CITY OF PITTSBURGH, WILLIAM PEDUTO Individually and in his official capacity as Mayor of the City of Pittsburgh; WENDELL HISSRICH, individually and in his official capacity as Director of Public Safety for the City of Pittsburgh; SCOTT SCHUBERT, individually and in his official capacity as Chief of the Pittsburgh Bureau of Police; STEPHEN VINANSKY, Commander of Zone 5 of the Pittsburgh Bureau of Police, in his professional capacity and individually; JASON LANDO, Commander of Narcotics and Vice for the Pittsburgh Bureau of Police, in his professional capacity and individually; JOHN DOE, Tactical Commander, in his professional capacity and individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## COMPLAINT

AND NOW, comes the Plaintiff John Doe, by and through his undersigned counsel Paul

Jubas, Esquire; the Law Offices of Paul Jubas; Max Petrunya, Esquire; and, Max Petrunya, P.C.,

makes files the following Complaint in Civil Action, averring as follows:

## PARTIES

1.     Plaintiff John Doe is an adult individual who resides in Pittsburgh, Allegheny

County, Pennsylvania, 15224.

2.     Plaintiff requests this Honorable Court allow anonymous proceeding in this matter based on the concrete risk of injury Plaintiff may suffer as a result of the revelation of Plaintiff's identity. M.M. v. Zavaras, 139 F.3d 798, 803 (10th Cir. 1998).

3.     As further detailed in Plaintiff's Complaint, in an effort to justify their unlawful and unconstitutional actions perpetrated against Plaintiff and others on June 1, 2020, Defendants have arrested and brought baseless charges against a number of individuals who not only participated in the May/June 2020 protests around the City, but also individuals who were innocent bystanders like Plaintiff who was harmed. The Defendants have gone as bringing baseless charges against individuals who simply videotaped the events which transpired and released this information to the local press.

4.     Following the attempted insurrection by domestic terrorists at the United State's Capitol Building on January 6, 2021, statements were released by the District Attorney and Mayor Bill Peduto indicating that charges would be refiled and/or brought against individuals involved in the social justice protests in Pittsburgh. Given these recent actions, in addition to the actions detailed later in Plaintiff's Complaint, anonymity for Plaintiff is vital to protect from any retaliatory criminal charges.

5.     Accordingly, Plaintiff is justified in requesting pseudonymity as Plaintiff's privacy and/or security from unlawful arrest or harassment from Defendants warrants proceeding anonymously. Doe v. Evans, 202 F.R.D. 173, 175 (E.D. Pa. 2001).

6.     This Honorable Court has broad discretion to decide whether to permit a plaintiff to proceed anonymously and, given the factual allegations in this Complaint and the documented actions of the Defendants as it relates to the events forming the basis of Plaintiff's Complaint, this

Honorable Court should permit Plaintiff to proceed anonymously. Doe v. C.A.R.S. Protection Plan, Inc., 527 F.3d 358, 371 n. 2 (3rd Cir. 2008).

7.      Defendant, City of Pittsburgh, (hereinafter referred to as "City" and/or "Pittsburgh"), is a municipality of the Commonwealth of Pennsylvania with its principal offices located at 414 Grant Street, 5th Floor, Room 512, Pittsburgh, Allegheny County, Pennsylvania, 15219.  At all times relevant hereto, the City of Pittsburgh was authorized to, and did, operate and maintain the Pittsburgh Bureau of Police (hereinafter referred to as "Pittsburgh Police" and/or "PBP"). At all relevant times hereto, this Defendant acted by and through its duly authorized agents, employees, and/or assigns, who were then and there acting within the course and scope of their employment, under the color of state law and in accordance with the customs, policies, and practices of the City of Pittsburgh.

8.      Defendant City of Pittsburgh Bureau of Police is a governmental entity which is organized and exists pursuant to the laws of the Commonwealth of Pennsylvania. The principal office of Defendant City of Pittsburgh Bureau of Police is located at 1203 Western Avenue, Pittsburgh, Allegheny County, Pennsylvania 15233. The Defendant's police officers have jurisdiction on and adjacent in Allegheny County. The Police Officers of such force are deployed with various lethal and non-lethal weapons for use in execution of their duties. At all times relevant hereto, Defendant City of Pittsburgh Bureau of Police was acting under color of state law and acted by and through its duly authorized agents, employees, and/or assigns, who were then and there acting within the course and scope of their employment. The perform of their job was done in accordance with the customs, policies, and practices of the City of Pittsburgh and City of Pittsburgh Bureau of Police.

9.      Defendant William Peduto (hereinafter referred to as "Mayor" and/or "Mayor Peduto" and/or "Defendant Mayor") is the Mayor of the City of Pittsburgh. At all times relevant, Peduto was the chief policymaker of the Defendant City of Pittsburgh. At all times relevant, Peduto ordered, authorized and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Peduto was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Defendant Mayor Peduto is sued in his official capacity as Mayor of Pittsburgh and in his individual capacity.

10.      Defendant Wendell Hissrich (hereinafter referred to as "Public Safety Director" and/or "DPS Hissrich") is the Director of the City of Pittsburgh Department of Public Safety. Hissrich is the chief policymaker for the City of Pittsburgh Department of Public Safety. At all times relevant, Hissrich ordered, authorized, participated in and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Hissrich was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Defendant Hissrich is sued in his official capacity as Public Safety Director and in his individual capacities.

11.      Defendant Scott Schubert is the Chief of the Pittsburgh Bureau of Police (hereinafter referred to as "Defendant Schubert," and/or "Chief of Police"). At all times relevant hereto, Schubert was a policymaker of Defendant City of Pittsburgh. At all times relevant hereto, Defendant Schubert ordered, authorized, participated in and/or acquiesced in the violation of Plaintiff's rights as alleged herein. At all times relevant, Schubert was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or

policies of the City of Pittsburgh. Defendant Schubert is sued in his official capacity Chief of Police and in his individual capacities.

12.     Defendant Stephen Vinansky is the Commander of Zone 5 of the Pittsburgh Bureau of Police (hereinafter referred to as "Commander Vinansky" and/or "Zone 5 Commander"). At all times relevant hereto, Defendant Vinansky ordered, authorized, participated in, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant hereto, Vinansky was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Defendant Vinansky is sued in his official capacity as Zone 5 Commander and in his individual capacities.

13.     Defendant Jason Lando is the Commander of Narcotics and Vice for the Pittsburgh Bureau of Police. At all times relevant hereto, Defendant Lando ordered, authorized, participated in, and/or acquiesced in the violations of Plaintiff's rights as alleged herein. At all times relevant, Defendant Lando was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Defendant Lando is sued in his official capacity as Commander of Narcotics and in his individual capacities.

14.     Defendant John Doe was the Tactical Commander of Pittsburgh Bureau of Police Special Weapons and Tactics (SWAT) Unit (hereinafter referred to as "SWAT Commander") during the events described herein. At all times relevant, Doe ordered, authorized, participated in, and/or acquiesced in the violation of Plaintiff's rights as alleged herein. At all times relevant, Doe was acting under color of state law, within the course and scope of his official duties and in accordance with the customs and/or policies of the City of Pittsburgh. Defendant Doe is sued in his official capacity as SWAT Commander and in his individual capacities.

## JURISDICTION AND VENUE

15.     Plaintiff seeks relief pursuant to violations of Constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, including compensatory damages, punitive damages, costs, attorneys' fees, and any other damages this Honorable Court determines necessary to compensate Plaintiff for injuries for which this suit was brought.

16.     This Honorable Court has federal question jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §1983. Plaintiff's state law claims are related to these federal claims and form a part of the same case or controversy. This Honorable Court accordingly has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this Court because the events described herein occurred in Pittsburgh, Pennsylvania, Allegheny County, located in the Western District of Pennsylvania.

## INTRODUCTION TO THE HISTORIC SOCIAL JUSTICE MOVEMENT OF 2020

18.     Following the heinous and unlawful murder of George Floyd, a Black man, by Minneapolis, MN police officers on May 25, 2020, a wave of sustained, large-scale peaceful demonstrations against racism and racialized police violence swept across the United States and spread throughout many parts of the world.

19.     Protestors gathered across the country to express their collective outrage regarding racial inequality and the continued abuse and murder of persons of color by law enforcement.

20.     These peaceful and organized protests were designed to provide the world with a first-hand view of the outrage felt by many Americans and were an international call to justice not

only for George Floyd's murder, but also for Breonna Taylor, Tony McDade, and numerous other Black people, indigenous people, and people of color killed by police in the United States.

21.     Protestors have also called for changes to address systemic racism and reshape the way matters of public safety are addressed in this country and in their communities.

## PITTSBURGH'S PEACEFUL PROTESTS REGARDING SOCIAL JUSTICE

22.     On June 1, 2020, people from Pittsburgh and surrounding communities assembled in the East Liberty neighborhood of the City of Pittsburgh to add their voices to these nationwide protests and seek change locally.

23.     The Pittsburgh Bureau of Police ("PBP") responded to these peaceful gatherings by turning these authorized and Constitutionally guaranteed gatherings into a scene of pandemonium, panic, violence, and bloodshed.

24.     Without any reason or provocation, the PBP deployed hundreds of officers to counter approximately 150 protestors. As the assembled protestors held their hands in the air and chanted, "This is not a riot," and "Hands up – Don't Shoot," PBP ordered its officers to attack them with explosives, chemical agents and ammunition which is known to seriously wound and sometimes kill its targets.

25.     PBP officers drove ambulances past injured protestors without stopping, denying these innocent individuals medical care they desperately required to deal with the injuries these peaceful protestors sustained at the hands of the PBP.

26.     In another move orchestrated by PBP for no other reason than to provide the pretext to attempt to harm citizens without justification, the PBP blocked off areas of ingress and egress for peaceful protestors to leave the area after PBP ordered them to leave. Without any means of

entry or exit, PBP officers locked the peaceful protestors escape with chemical gas, riot police, and mounted patrols.

27.     After creating this dangerous situation, PCP then arrested several protestors for failing to disperse, subjecting them to unlawful confinement in close quarters in the midst of the global COVID-19 pandemic.

28.     The PBP ordered tactical officers dressed in paramilitary garb to patrol a residential neighborhood in armored vehicles and arbitrarily throw canisters of chemical gas and/or arrest anyone they encountered.

### PLAINTIFF JOHN DOE

29.     Plaintiff is an adult individual who resides in Pittsburgh.

30.     Like most individuals, Plaintiff recognized that the peaceful social justice events happening across the country marked a historic moment in American history and the culmination of years of racial injustice and disparity.

31.     Without wanting to protest or be involved in the protests, Plaintiff still wished to watch the demonstrations from a distance to witness this historical event first-hand.

32.     Plaintiff rode by bike into East Liberty, not to protest, but to watch the protests from the side of the street and took great care to distinguish from the protestors on the street by wearing a reflective vest.

33.     Plaintiff sat off to the side in front of a fenced in area on Centre Avenue in East Liberty as approximately 150 peaceful and unarmed protestors encountered hundreds of PCP officers.

34.     Despite his efforts to remain as a spectator of the protests and avoid any confrontation with protestors or police, Plaintiff was subjected to unnecessary, unlawful,

unconstitutional violence and excessive force at the hands of Defendants which resulted in Plaintiff suffering serious, critical, and life-long injuries, which are detailed later in Plaintiff's Complaint.

35.     The conduct Plaintiff was subjected to on June 1, 2020 by Defendants' violated First Amendment right to assembly, Fourth Amendment rights to be free from excessive force, and Fourteenth Amendment right not to be subjected to official governmental policies, patterns, and practices which violated individuals, and others, constitutional rights.

**City Officials were on notice that the PBP could and would indiscriminately
use excessive force against peaceful protestors**

36.     The May 25, 2020 videotaped police murder of George Floyd sparked public outrage and an unprecedented social justice movement.

37.     This movement included weeks of peaceful protests against racism and police violence throughout the United States that continue to this day.

38.     Numerous peaceful protests took place in and around Pittsburgh, Pennsylvania in response to the social justice movement taking place throughout the country.

39.     On Saturday, May 30, 2020, thousands of concerned residents of the City of Pittsburgh and surrounding areas gathered in Pittsburgh's Downtown area to protest police racism and violence. The vast majority of the attendees did not engage in any property damage or violence.

40.     Following some limited and isolated reports of property damage, PBP decided to use chemical gas, rubber bullets, and other projectiles, pepper spray, flashbang grenades, and other riot control agents indiscriminately against everyone present on May 30, 2020, including peaceful protestors and nonviolent bystanders, unprovoked and without justification. These weapons were also used in a manner not intended by the manufacturers and were used with the intent to harm innocent individuals.

41.     Numerous protestors were seriously injured as a result of the PBP's dangerous, unconstitutional, and unnecessary use of lethal force against protestors on May 30, 2020.

42.     Based on the injuries sustained by the protestors by these "non-lethal" crowd disbursement weapons, the Defendants were on notice that the PBP would engage in conduct designed for no other reason than to harm protestors and violate their Constitutional rights.

43.     In an effort to attempt to justify its unlawful and unconstitutional actions, the PBP arrested 46 people at the protests for "failure to disperse."

44.     These baseless charges were ultimately not pursued by the Allegheny County District Attorney against at least 39 of these arrestees because the PBP's evidence was insufficient to support the charges.

45.     This factual information supports Plaintiff's request to proceed anonymously.

46.     As a result of the PBP's actions on May 30, 2020, Defendants Peduto, Hissrich, and Schubert had actual and/or constructive notice that PBP officers would use overwhelming and excessive force against peaceful protestors with little or no provocation or legal justification.

47.     Furthermore, the manner by which this unconstitutional and excess force was used on May 30, 2020 directly contradicted the training and safe use of these potentially lethal weapons which are designed to control crowds, not inflict serious and significant injuries against individuals. The use of these weapons in this manner is a prime example of the malicious, reckless, and wanton intent of the PBP, which shows their deliberate indifference to the rights of peaceful protestors.

48.     As a result of the PBP's actions on May 30, 2020, Defendants Peduto, Hissrich and Schubert were on notice that PBP officers would harm, arrest, and jail peaceful protestors with little or no evidence, or probable cause, to support criminal charges.

49.     Defendants Peduto, Hissrich and Schubert supported the PBP actions and ratified such conduct by either directly supporting it, or, through inaction, not taking any measures to prevent such heinous conduct from happening again.

50.     Defendants Peduto, Hissrich and Schubert made no effort to ensure that such indiscriminate use of force did not occur at future protests, and did nothing, in derogation of their obligations in their administrative and individual capacities, to protect citizens of Allegheny County and Plaintiff from sustaining any injuries or harm from this unconstitutional and unnecessary use of excessive force by the PBP and "Riot Squad."

## PBP used similar excessive force the next day against peaceful protestors on June 1, 2020

51.     On June 1, 2020 thousands of concerned Pittsburgh residents again gathered to peacefully protest police racism and violence, this time in the East Liberty neighborhood of the City of Pittsburgh.

52.     Plaintiff observed the protest from a fence off to the side of the protestors on the street because, despite not wanting to participate in the protests, wanted to watch history unfold in the city.

53.     The East Liberty protestors marched peacefully in the street in the vicinity of Penn Avenue and Centre Avenue from approximately 3:30 pm until approximately 6:30 pm.

54.     Historically, Defendants Peduto, Hissrich, Schubert and the City of Pittsburgh have permitted, approved and/or encouraged similar protests in Pittsburgh streets.

55.     Given the gravity of the George Floyd murder, uniformed Pittsburgh Bureau of Police (PBP) officers approved and/or encouraged the protestor's activities by, inter alia, marching with them, communicating with organizers, blocking off streets and redirecting traffic.

56.     By attending, approving, encouraging, and assisting the protestors activities, Defendants communicated to them that they were properly and lawfully exercising their First Amendment rights in a time, place and manner that Defendants considered reasonable.

57.     At approximately 6:30 pm, the protestors congregated at the Target store located at the corner of Penn Avenue and Centre Avenue. Many either remained at that location or left the area.

58.     Between 6:30 pm and 7:00 pm, a much smaller group of 100 to 150 protestors continued to march down Centre Avenue toward Negley Avenue.

59.     These protestors continued to march peacefully down Centre Avenue for over half a mile.

60.     Although Defendant Peduto had implemented a curfew for the City of Pittsburgh on June 1, 2020, this curfew would not go into effect until 8:30 pm, nearly two hours later.

61.     Accordingly, these 100 to 150 peaceful protestors were lawfully exercising their Constitutional rights in a time, place, and manner that did not violate any laws, executive orders, or ordinances issued by the City of Pittsburgh, Public Safety, or the Mayor.

62.     As these peaceful protestors continued to peacefully march, approximately 50 to 100 PBP officers formed a line across Centre Avenue at Negley Avenue, blocking the Protestors' path.

63.     In a scene that is virtually identical to the 1968 Chicago Protests, the officers blocking these peaceful protestors wore helmets, face shields and gas masks. Despite the fact that the protestors were all peaceful, every officer held either a baton or a firearm.

64.     Additional officers were dressed in military gear including camouflage, helmets and gas masks. These officers carried firearms and other tactical gear.

65.     Some of the officers also had police dogs which, again, was unnecessary given that all of the 100 to 150 protestors were peaceful and lawfully exercising their constitutional rights.

66.     On information and belief, these officers were members of the PBP Special Weapons and Tactics ("SWAT") Team.

67.     At about the same time as the above described PBP officers blocked the Protestors' path on Centre Avenue, other PBP officers and/or law enforcement officers acting under the direction of PBP and acting under color of state law formed similar lines across other East Liberty streets in an effort to block these peaceful protestors.

68.     The peaceful protestors stopped on Centre Avenue approximately 30 feet from the line of police officers.

69.     The protestors remained peaceful despite the heavily armed police presence unnecessarily displayed by law enforcement in response to this peaceful protest.

70.     The protestors' behavior was not materially different from the behavior of the larger group of protestors earlier in the day, which the PBP openly approved and supported.

71.     In an effort to protect themselves, groups of the peaceful protestors symbolically chanted, "Hands up – Don't Shoot," "This is not a riot," "Join us," and similar phrases. Some protestors knelt on the ground with their hands in the air in an effort to display that they posed no threat to law enforcement and that no violence or force was necessary.

72.     The protestors did not damage public or private property and did not engage in any aggressive or violence inciting behavior.

73.     The protestors did not throw bricks or rocks at the PBP officers.

74.     The protestors did not engage in any activity that could have given rise to a reasonable belief that they were likely to cause substantial harm or serious inconvenience, annoyance, or alarm to the police, other protestors, public or private property, or the public at large.

75.     The peaceful protestors did not present an imminent threat to public safety, peace or order.

76.     Nevertheless, on information and belief, Defendant Doe and/or other individually named Defendants made the decision to declare the Protestors' assembly unlawful and order the Protestors to disperse.

77.     Defendants Peduto, Hissrich and Schubert were either present during the above-described events or were otherwise aware of them as they occurred. These three defendants either made the decision to declare the assembly unlawful or approved of that decision and the basis for that decision.

78.     At approximately 7:17 pm, a PBP officer (possibly Defendant Doe) made the following announcement (hereinafter "unlawful assembly announcement"):

> I am Officer [unintelligible] of the Pittsburgh Police. I hereby declare this to be an unlawful assembly. I order all those assembled at this location to immediately disperse. You must leave this immediate vicinity. If you remain in this vicinity you are in violation of the Pennsylvania crimes Code. No matter what your purpose is you must leave. If you do not disperse you will be arrested and/or subject to other police action. Other police action may include actual physical removal, the use of riot control agents and/or less lethal munitions which could cause the risk of injury for those who remain. You must immediately leave outbound on Centre Avenue. [Unintelligable]

79.     At this time, Centre Avenue outbound was blocked by numerous police vehicles and/or riot control officers.

14

80.     Shortly after the first "unlawful assembly announcement" was made, PBP deployed a Long-Range Acoustic Device ("LRAD") against the Protestors. A LRAD is a military-grade weapon that emits a "deterrent tone" so loud it can cause permanent hearing loss.

81.     It should be noted these same tactics and signal emitted devices were utilized by the police a decade earlier at the G-20 protests.

82.      Densus, an international riot and tactical consulting company, reviewed the facts of the G-20 protests and determined that the posture taken by the police was too aggressive and contributed to inciting the crowd at the G-20.

83.     Given that these exact same tactics were employed by the Defendants on June 1, 2020, it is clear that the Defendants were on notice of the issues posed by their tactics and failed, as a pattern and practice, to ensure that this same conduct would never happen again.

84.     Police warned the Protestors not to "advance" on their line. However, nearly all of the Protestors were at least 30 feet away from the officers. At no time did any Protestor "advance" on the officers.

85.     The PBP officer made more "unlawful assembly announcements" over the next several minutes and continued to deploy the LRAD.

86.     An unknown PBP officer discharged a firearm into the crowd hitting a Protestor in the knee. Other Protestors dragged the injured protestor to the sidewalk and offered him assistance.

87.     Despite this aggressive, unnecessary, and unlawful action by the PBP, the Protestors remained peaceful. They continued chanting but did not disperse. The Protestors did not throw rocks, bricks or bottles. The Protestors did not destroy property or commit acts of violence or vandalism. The Protestors did not advance on the police.

88.    Despite this lack of any destruction, property damage, or violent behavior by the Protestors, on information and belief, Defendant Doe ordered the PBP officers to use force against the Protestors.

89.    The PBP and Defendants made no attempt to communicate to the Protestors why the assembly was declared unlawful.

90.    The PBP and Defendants made no attempt to communicate to the Protestors why they were being ordered to disperse.

91.    In the middle of an unlawful assembly announcement, a PBP officer suddenly threw a "flashbang" grenade at the crowd. A "flashbang" grenade is an explosive device designed to frighten and disorient an enemy through a blinding flash or light and extremely loud explosive noise.

92.    Immediately following the detonation of the flashbang grenade, PBP officers began firing "rubber bullets." "beanbag rounds" and/or "sponge grenades" at the Protestors.

93.    "Rubber bullets" are large rubber coated metal cylinders which can be fired from standard firearms or dedicated "riot guns." Beanbag rounds" are cloth bags filled with lead shot which are fired from a 12-gauge shotgun. "Sponge grenades" are large plastic or metal bullets with dense foam rubber tips. They are typically fired from a 40mm grenade launcher.

94.    Although these items are often referred to as "less lethal" munitions, they are fired with the force of a gun or grenade launcher and have the capability to cause serious injury and/or death, particularly when fired at close range or when fired at vulnerable areas of the body.

95.    The proper method of deployment of these "less lethal" munitions is to fire the objects at the ground, and not directly at individuals, so as not to cause serious harm or injury. This

information was either not provided to PBP officers during training or the PBP officers willfully, maliciously, and blatantly ignored this training in an effort to purposely harm individuals.

96.    Videos from the scene of the protest show numerous PBP officers firing their munitions directly at crowds. PBP officers were not even attempting to fire these weapons into the ground which shows their failure to adhere to their training and is further evidence of their deliberate indifference to the health, safety, and welfare of the general public in violation of these individuals' Constitutional rights.

97.    PBP officers also threw and/or shot canisters into the crowd, some of which emitted smoke ("smoke bombs") and some of which emitted chemical gas commonly referred to as "tear gas" ("chemical grenades.")

98.    "Tear gas" generally refers to chemical agents that cause tearing, coughing, difficulty breathing, skin irritation and/or vomiting. Tear gas grenades can be thrown or fired from a grenade launcher. Tear gas can cause serious complications for people with respiratory problems. Exposure to tear gas also increases individual's susceptibility to the COVID-19 infection and/or complications.

99.    Numerous Protestors were injured by tear gas thrown into the crowd.

100.    Many Protestors were coughing, had tears streaming down their faces, and had difficulty breathing and seeing. The tear gas caused some Protestors to vomit.

101.    The combination of explosions, gunfire, smoke, and gas caused many of the Protestors to panic and run outbound on Centre Avenue and into nearby streets.

102.    The PBP officers immediately began to march outbound on Centre Avenue, continuing to indiscriminately and with deliberate indifference shoot rubber bullets, beanbag rounds and/or sponge grenades at the fleeing Protestors as they ran away.

103.    The smoke created from the PBP's smoke bombs and chemical gas grenades was so thick that the officers could not see what or who they were shooting.

104.    Videos taken from the scene show PBP officers shooting blindly into smoke-filled Centre Avenue as Protestors ran away.

105.    The marching PBP officers were flanked on the sidewalks by PBP SWAT officers who pointed their firearms at Protestors, shoved them and yelled at them.

106.    As the PBP officers advanced, they continued to deploy chemical gas grenades, sometimes throwing them at Protestors as they fled.

107.    PBP officers deployed oleoresin capsicum ("OC" or "pepper") spray on fleeing and/or peaceful Protestors.

108.    Multiple video recordings from the scene show two Protestors in an alley as the line of PBP officers' approaches. The Protestors are on their knees with their hands in the air. An officer sprayed an unknown substance, believed to be OC spray, into the Protestors' faces multiple times from a distance of approximately five feet, causing them to run. A SWAT officer then throws a cannister, believed to be a chemical gas grenade, at the fleeing Protestors as another officer shoots an unknown munition at them.

109.    As the PBP officers advanced, they knowingly shot at peaceful Protestors from dangerously close range.

110.    Multiple video recordings from the scene depict a line of officers advancing on three Protestors (two men and a woman). The Protestors slowly walk backwards with their hands raised. A SWAT officer shoots the female Protestor in the chest with an unknown munition from a distance of approximately 10 feet.

111.    The PBP used advancing lines of officers and chemical gas to cut off avenues of escape for fleeing Protestors. As a result, Protestors were forced to choose between approaching a line of officers or retreating into clouds of chemical gas.

112.    PBP officers shot and threw chemical gas cannisters at trapped Protestors.

113.    PBP officers continued to deploy chemical gas and other munitions on Protestors, bystanders and passers-by throughout East Liberty long after the Protestors had dispersed and over a half mile away from where the Protestors had initially assembled.

114.    At all times relevant, at least one ambulance was at the scene and was escorted by an armored SWAT vehicle. This ambulance was not used to provide medical treatment or transportation to injured Protestors or observers, such a Plaintiff. On information and belief, this ambulance was requested by PBP and was reserved to treat PBP personnel.

115.    On information and belief, the PBP made no effort to ensure that EMTs or other trained medical professionals were available to treat injured Protestors or observers such as Plaintiff, despite knowing that the level of force they planned to use against Protestors was likely to cause serious injury or death.

116.    On information and belief, PBP officers prevented EMTs from entering the area and treating injured Protestors and observers, such as Plaintiff.

117.    Because the PBP did not ensure that EMTs were available to treat Protestors and/or prevented EMTs from treating Protestors, injured Protestors, and observers such as Plaintiff, received medical assistance by untrained and unqualified individuals and were transported to the hospital in cars and pickup trucks.

118.    The actions of the PBP in failing to provide medical attention and/or allow access to medical treatment shows reckless, willful, and deliberate indifference to the health, safety,

welfare, and interests of Plaintiff and other individuals who were harmed as a result of the unlawful and unconstitutional conduct of Defendants on June 1, 2020.

119.    Numerous Protestors, and at least one bystander who was not even participating in the peaceful protest (Plaintiff) were hit with rubber bullets, bean bag rounds and sponge grenades. Some were seriously injured, including Plaintiff, and required hospitalization.

## INJURIES TO BYSTANDER PLAINTIFF

120.    Plaintiff, who was only observing the protests throughout the day, was hit in the face with an unknown munition and knocked unconscious.

121.    Plaintiff suffered serious injuries and began bleeding profusely.

122.    Protestors dragged Plaintiff from the fenced area where he was standing to a nearby parking garage in an attempt to render medical aid.

123.    As Protestors attempted to help Plaintiff, a SWAT officer threw a chemical grenade at them.

124.    One of the individuals who was assisting Plaintiff attempted to speak to members of the PBP to urge them to help Plaintiff who this individual believed was in danger of dying from injuries.

125.    For this individual's efforts, video show the individual was pepper-sprayed by the PBP. Again, this is a blatant, senseless, unnecessary, and unconstitutional use of force by the PBP and further shows the depraved, malicious, wanton, reckless, and deliberate indifference of the PBP to the rights of individuals who are attempting to seek medical attention for individuals injured by the unconstitutional and unlawful conduct of the Defendants.

126.    No ambulance arrived to treat or transport Plaintiff, so Protestors eventually drove Plaintiff to the hospital where Plaintiff was treated for numerous injuries.

127.    On June 1, 2020, Plaintiff was admitted to UPMC through the Emergency Department for a facial fracture.

128.    Plaintiff remained in the hospital until June 3, 2020 when discharged to home.

129.    Plaintiff was emergently re-admitted to UPMC on June 8, 2020 for continued complaints stemming from this serious head injury sustained on June 1, 2020.

130.    Plaintiff was conservatively treated for these injuries but the symptoms continued.

131.    Plaintiff was readmitted to UPMC on June 28, 2020 when it was discovered that Plaintiff had developed a carotid pseudoaneurysm as a result of being struck in the head with a rubber bullet on June 1, 2020.

132.    A carotid pseudoaneurysm is a potentially fatal injury which requires significant medical treatment. Neurological injuries like those sustained by Plaintiff on June 1, 2020 as a result of the unlawful and unconstitutional actions of the Defendants are life-long injuries that can affect individuals cognitive functioning and require consistent medical treatment and monitoring.

133.    Plaintiff underwent emergent intubation and surgery at UPMC for his multiple head injuries sustained from the excessive, unlawful, and unconstitutional force used by the PCP on June 1, 2020, including the potential fatal carotid pseudoaneurysm.

134.    As a result of the unconstitutional, unnecessary, and excessive conduct of Defendants, Plaintiff has sustained the following injures:

> *a.*   Severe facial bone fractures;
>
> *b.*   Epidural Hemorrhage;
>
> *c.*   Trauma;
>
> *d.*   Calvarial fracture; and,
>
> *e.*   Carotid pseudoaneurysm.

135.    To this day, Plaintiff continues to receive treatment for injuries and will most likely continue to suffer from a lifetime of neurological issues and necessary medical treatment as a result of the injuries sustained because of the Defendants.

### DEFENDANTS EFFORTS TO "COVER UP" THEIR ACTIONS

136.    In the aftermath of the PBP's unwarranted, unlawful, and unconstitutional attack on peaceful protestors, City of Pittsburgh officials, including the Mayor, Public Safety Director and Chief of Police, disseminated flagrant lies to conceal and/or justify the PBP's shameless use of force against peaceful protestors. These officials accused protestors of hurling rocks and "volleys of bricks" at PBP officers, and vehemently denied using chemical agents. Numerous videos demonstrate that these statements were patently false.

137.    The post-conduct acts of the Defendants show that Defendants knew, or should have known, that their conduct was unlawful and unconstitutional. It also displays the culpability of Defendants and is used to show the pattern, practice, willful, and deliberate indifference to the rights of Plaintiff and other individuals who were injured as a result of the conduct of the Defendants on June 1, 2020.

138.    This post-conduct also further justifies Plaintiff's request to proceed anonymously in this litigation.

139.    PCP officers arrested trapped Protestors and falsely charged them with failure to disperse and disorderly conduct.

140.    PBP arrested and criminally charged 22 people on June 1, 2020 in relation to the protest and in an effort to protect and justify its unlawful and unconstitutional actions.

141.    Despite a lack of probable cause for these arrests, the PBP transported the 22 arrestees to the Allegheny County Jail where they were confined for hours in close quarters, in an area known to cause an increased risk of contracting COVID-19.

142.    At 11:00 on the evening of June 1, 2020, Individual Defendants Peduto, Hissrich, Schubert, Vinansky, Lando and Doe (hereinafter "Individual Defendants") held a press conference.

143.    At the press conference, Defendants Peduto, Hissrich and Schubert praised the actions of the PBP toward the Protestors in East Liberty that evening.

144.    Defendant Hissrich stated:

> And I just want to mention that the work that was done by the officers… tonight should be commended… I think we prevented businesses from being looted and possibly set afire. So I just want to commend all the public safety, the different law enforcement agencies that were out there tonight, and I think the public, they should be thanking the police officers for the work that they have done.

145.    Defendant Schubert stated:

> I give a lot of credit to the officers who were there because I watched them. They did an incredible job. They did an incredible job trying to keep the public safe while they were out there.

146.    Defendant Peduto stated:

> … it was then that the officers escalated to the point of being able to break the crowd up, and that finally succeeded. What we did not see is East Liberty is not on fire tonight. People from East Liberty are not harmed. Two protestors were taken for evaluation, and they should be absolutely fine. Nine officers were hurt by protestors.

147.    In order to justify the PBP's unwarranted violence against peaceful Protestors, Individual Defendants falsely accused the Protestors of misconduct and wrongdoing. These false accusations included:

i. that Protestors vandalized buildings and broke glass windows;

ii. that Protestors engaged in acts of violence and destruction;

iii. that Protestors attacked a KDKA television news crew;

iv. that Protestors attacked Defendant Vinansky in his police vehicle;

v. that Protestors were trying to or intended to "burn East Liberty down,";

vi. that Protestors were "only there to cause damage and to try to hurt police officers";

vii. that the PBP's use of force was precipitated by Protestors throwing rocks and bricks at their heads, chests, pelvis areas, knees and shoulders;

viii. that PBP used force against the Protestors only after the Protestors thre multiple "volleys of bricks" at officers;

148.    Following the protests, Individual Defendants also attempted to minimize the level of force PBP used by falsely claiming that:

i. the only force PBP used against the Protestors was "smoke;"

ii. PBP did not use chemical gas against Protestors;

iii. PBP did not use, "crowd munitions" against Protestors;

iv. PBP did not use "rubber bullets" against Protestors;

v. Only two Protestors were injured by PBP use of force;

vi. No Protestors were seriously injured by PBP use of force;

vii. City of Pittsburgh personnel treated all injured Protestors at the scene and transported them to hospitals.

149.    Despite their efforts to justify the unlawful and unconstitutional actions of law enforcement on June 1, 2020, the Allegheny County District Attorney's Office withdrew charges against all 22 people arrested and charged by PBP due to a lack of evidence on June 18, 2020.[1]

---

[1] https://triblive.com/local/pittsburgh-allegheny/charged-dropped-for-22-protesters-arrested-in-east-liberty-melee/

**Defendants' Response, or lack thereof, to more dangerous protestors prior to June 1, 2020
shows that Defendants could not have believed that their actions are justified**

*January 7, 2019 "Open Carry" Rally at City-County Building*

150.    On January 7, 2019 individuals assembled in front of Pittsburgh's City-County
building in downtown Pittsburgh to protest Mayor Bill Peduto's support of a bill to restrict "open
carry" laws related to guns.

151.    Multiple protestors stood on the street in downtown Pittsburgh carrying assault
rifles and other deadly weapons.

152.    At no point during this demonstration involving weapons that could harm
individuals at the snap of a finger, the PBP and Defendants did not fire rubber bullets, tear gas, or
other "crowd control" devices at this group of protestors.

153.    None of the protestors were arrested and no one was harmed during this protest,
despite individuals in Pittsburgh saying they felt unsafe having individuals with deadly weapons
lining the street.

154.    The actions, or inactions, the PBP in response to this protest shows the
discriminatory nature of the PBP in its decision to resort to violence against peaceful protestors
marching against racial injustice while not laying a finger on individuals openly carrying
dangerous weapons.

155.    Fourteen months later, the PBP would take similar inaction against agitated
protestors wielding assault rifles in front of the City-County building.

*April 20, 2020 "Take Back Control" Rally at City-County Building*

156.    On April 20, 2020 protestors congregated on Grant Street in Downtown Pittsburgh
to protest Governor Tom Wolf's decision to close businesses due to the COVID-19 pandemic.

157.   Many of the April 20, 2020 Protestors openly carried tactical rifles and wore paramilitary outfits. A group of these protestors referred to themselves as "The Iron City Response Guard." When asked by a reported why they had armed themselves in this manner for a peaceful protest, one belligerently responded, "Why not?"

158.   The protestors did not have a permit for their protests and appeared extremely more threatening than any of the protestors on May 31, 2020 and June 1, 2020 given that they were openly carrying deadly weapons.

159.   In stark contrast to the April 20, 2020 protestors, the June 1, 2020 peaceful protestors were not carrying tactical rifles, or any other firearms. The June 1, 2020 peaceful protestors were not dressed in paramilitary outfits and did not outwardly display any threatening, scary, or violent behavior or objects.

160.   The unarmed and peaceful June 1, 2020 protestors posed less of a threat of "substantial harm or serious inconvenience, annoyance or alarm" to the residents of the City of Pittsburgh than the heavily armed April 20, 2020 protestors.

161.   On information and belief, the PBP did not deploy SWAT units, armored vehicles, riot police, and/or snipers to the April 20, 2020 protests, despite an overwhelming number of deadly weapons and unstable individuals protesting in front of government buildings.

162.   The PBP did not declare the April 20, 2020 protests to be unlawful, order the protestors to disperse, and/or use force to disperse them like the force used on June 1, 2020.

163.   The PBP did not fire any rubber bullets, tear gas, or pepper spray at any of these protestors.

164.   These inactions against individuals protesting "shut down" orders designed to curb the spread of the deadly Covid-19 virus stand in stark contrast to the violent actions of the PBP in

response to individuals protesting systemic and long-standing racial injustice. This contrast is further indication of the discriminatory nature of the PBP and its response to protestors based on the cause being protested.

### City of Pittsburgh Officials were aware of, acquiesced in and/or failed to intervene to prevent the violation of the Protestors' Constitutional rights

165.    Individual Defendants witnessed or were otherwise aware of the events described herein as they unfolded.

166.    Individual Defendants were aware that the June 1, 2020 Protestors were peaceful and were engaged in constitutionally protected speech.

167.    Individual Defendants did not have a reasonable expectation that the Protestors would cause substantial harm or serious inconvenience, annoyance, or alarm.

168.    Individual Defendants did not have reason to believe that the Protestors presented an imminent threat to public safety, peace, or order.

169.    Individual Defendants ordered, authorized and/or acquiesced in the order to declare the assembly unlawful.

170.    Individual Defendants ordered, authorized and/or acquiesced in the use of excessive force against Protestors.

171.    Individual Defendants had the opportunity to intervene to prevent the violation of the Protestors constitutionally protected rights and failed or refused to do so.

### The decision to use force constituted the official policy of the City of Pittsburgh

172.    Defendants Peduto, Hissrich and Schubert, jointly and/or individually, possessed final policymaking authority to make the decision to 1) declare Protestors' assembly unlawful. 2) use force to disperse Protestors and 3) use noxious chemical gas and extremely dangerous and painful rubber bullets, beanbag rounds and/or sponge grenades against Protestors.

173.   Defendants Peduto, Hissrich and Schubert jointly and/or individually made, approved, and/or acquiesced in these decisions to violate Protestors' constitutional rights.

174.   The violation of Protestors' rights was the direct result of the official policy of the City of Pittsburgh.

### PBP violated its policy regarding discharge of less lethal munitions

175.   PBP's policy regarding discharge of less lethal munitions does not provide for the use of rubber bullets or sponge grenades. Nevertheless, PBP officers shot peaceful protestors with rubber bullets and sponge grenades.

176.   PBP's policy regarding discharge of less lethal munitions does not permit discharge from less than 20 feet. Nevertheless, officers discharged rubber bullets, beanbags and/or sponge grenades at peaceful protestors, and at Plaintiff who wasn't even participating in the protests, from a distance of far less than 20 feet.

177.   PBP policy recognizes that:

> The use of kinetic energy impact projectiles are considered deadly force, if intentionally deployed to areas of the subjects [sic] body that are recognized as likely to cause serious bodily injury or death (head, neck, throat, chest or solar plexus)." PBP policy prohibits officers from targeting these areas of a person's body unless deadly force is justified. Nevertheless, PBP officers fired hundreds of rubber bullets, beanbags and/or sponge grenades indiscriminately into clouds of smoke through which they could not see the Protestor's bodies. As a result, Protestors were hit with projectiles in area of their bodies likely to cause serious bodily injury and were, in fact, injured.

178.   PBP policy requires officers to transport persons subject to kinetic energy impact projectiles to a medical facility for evaluation and treatment. PBP did not transport Protestors injured by rubber bullets and bean bags to medical facilities, or render any medical aid whatsoever, even though an ambulance accompanied police vehicles. PBP did not pre-arrange for medical care

or transportation for injured Protestors, even though it intended to use levels of force which were likely to cause injury or death to Protestors.

179.    PBP's failure to follow its own policy regarding discharge of less lethal munitions constituted deliberate indifference to the rights of Plaintiffs.

### PBP failed to adopt necessary policies and procedures regarding crowd control

180.    The PBP does not have a policy governing the declaration of assemblies as "unlawful" and the forced dispersal of protests, even though the need for such a policy is obvious.

181.    The PBP does not have a policy governing the use of chemical gas, flashbang grenades, and/or smoke bombs even though the need for such a policy is obvious.

182.    PBP's failure to adopt these policies constituted deliberate indifference to the constitutional rights of Plaintiff and the peaceful Protestors with whom PBP officers come into contact.

### PBP failed to properly train officers regarding crowd control

183.    PBP's use of force training curriculum does not address, or does not properly address, crowd/riot control techniques, use of impact munities, chemical gas, flashbang grenades and/or smoke bombs.

184.    PBP does not train, or does not properly train, officers in crowd control/riot techniques.

185.    PBP does not train, or does not properly train, officers in the use of munitions such as rubber bullets, bean bag rounds and/or sponge grenades.

186.    PBP does not train, or does not properly train, officers in the use of chemicals, such as "tear gas" and/or OC spray for crowd control purposes.

187.    PBP does not train, or does not properly train, officers in the use of flashbang devices and/or smoke bombs for crown control purposes.

188.    PBP's failure to train its officers, as hereinbefore described, constituted deliberate indifference to the rights of Plaintiffs and other peaceful protestors with whom PBP officers come into contact.

**The City of Pittsburgh has acknowledged its failures related to the protest and admitted its <u>failure of officers to use proper training and techniques in response to protestors</u>**

189.    In response to the heinous actions of the PBP related to the May 31, 2020 and June 1, 2020 protests, Mayor Bill Peduto, in his official capacity as policy maker and Mayor of Pittsburgh, commissioned a Community Taskforce for Police Reform.

190.    The determinations and recommendations of this Task Force were published by the Mayor's office which shows a ratification and acknowledgement of the findings of this Task Force by the Mayor.

191.    A complete copy of this October 2020 Task Force Report is attached hereto as Exhibit 1.

192.    Specifically related to the actions of Defendants related to the injuries sustained by Plaintiff on June 1, 2020, the Task Force's Report clearly establishes that, as a pattern and practice the PBP:

> *a.*    Does not have effective policies and training for the discharge of bean bag, rubber bullets, and other crowd control munitions;
>
> *b.*    Willfully ignored their training related to the discharge of these munitions, if these officers were properly trained on the discharge of these weapons;
>
> *c.*    Engaged in a practice of "kettling" whereby PBP restricts methods of ingress and egress for protestors to provide the

backdrop for engaging in violent, unlawful, and unconstitutional uses of excessive force; and,

*d.*     The use of force policies needs changed.

193.    This report further confirms that individuals, like Plaintiff, were struck with bean bags and rubber bullets fired by the PBP. Thus, there is no questioning the actions of the PBP and the cause of Plaintiff's injuries in this matter.

## COUNT I

### Plaintiff v. Individual Defendants

### Violation of the Fourth Amendment to the
### United States Constitution - Excessive Force and Failure to Intervene

194.    Plaintiff incorporates all prior paragraphs of this Complaint herein by reference.

195.    Defendants' actions, as outlined above, violated Plaintiff's Fourth Amendment right to be free from the use of excessive force.

196.    The Defendants failed to intervene when they knew, or should have known, that the Defendants were depriving Plaintiff of Constitutional rights to be free from bodily injury and unnecessary, unlawful, and unnecessary force.

197.    As a direct and proximate result of Defendants' conduct, as outlined above, Plaintiff suffered physical injury and/or emotional and psychological pain and suffering.

198.    As a direct and proximate result of the Defendant's conduct, Plaintiff suffered a loss of liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses and future medical expenses for treatment and care. These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of civil rights.

## COUNT II

### Plaintiff v. City of Pittsburgh

### Violation of the First and/or Fourteenth Amendment to the United States Constitution

199.    Plaintiff incorporates all prior paragraphs of this Complaint herein by reference.

200.    Defendant City of Pittsburgh's conduct, as hereinbefore described, was the direct and proximate cause of violations of Plaintiff's First Amendment Rights to freedom of speech and freedom to peaceably assemble.

201.    As a direct and proximate result of Defendant's conduct, as outlined above, Plaintiff suffered physical injury and/or emotional and psychological pain and suffering in violation of Fourth Amendment rights.

202.    As a direct and proximate result of the Defendant's conduct, Plaintiff suffered a loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses and future medical expenses for treatment and care. These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights.

## COUNT III

### Plaintiff v. City of Pittsburgh

### Violation of Fourth and/or Fourteenth Amendment of U.S. Constitution - Excessive Force

203.    Plaintiff incorporates all prior paragraphs of this Complaint herein by reference.

204.    Defendant City of Pittsburgh's conduct, as hereinbefore described, was the direct and proximate cause of violations of Plaintiff's Fourth Amendment Rights to freedom from excessive force.

205.    Defendant City of Pittsburgh and its officials failed to intervene when it knew, or should have known, that the PBP was depriving Plaintiff of Constitutional right to be free from bodily injury and engaging in unlawful and excessive force.

206.    As a direct and proximate result of Defendant's conduct, as outlined above, Plaintiff suffered physical injury and/or emotional and psychological pain and suffering.

207.    As a direct and proximate result of the Defendant's conduct, Plaintiff suffered a loss of liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses and future medical expenses for treatment and care. These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of civil rights.

**COUNT IV**

**Plaintiff v. John Doe Defendant**

**<u>Battery</u>**

208.    Plaintiff incorporates all prior paragraphs of this Complaint herein by reference.

209.    Defendant John Doe's actions against Plaintiff in using unreasonable, unlawful, unnecessary, and unconstitutional force in firing a rubber bullet directly at the head and face of Plaintiff with a depraved indifference to human life and conscious disregard for the safety of the general public constituted an intentional unwelcome and unprivileged touching of Plaintiff, and was undertaken in bad faith with actual malice.

210.    As a direct and proximate result of the Defendant's conduct, Plaintiff suffered a loss of liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses and future medical expenses for treatment and care. These losses are either

permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of civil rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

(a) Declare that the actions of the Defendants constituted violations of the Fourth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983;

(b) Judgment in Plaintiff's favor to all claims for relief;

(c) Award compensatory damages for the injuries sustained by Plaintiff due to the Defendants' conduct for all economic and non-economic damages Plaintiff has, and will continue to, sustain, including, but not limited to, damages for medical treatment, future medical treatment, pain, suffering, embarrassment, humiliation, mental anguish, and loss of enjoyment of life's pleasures;

(d) Award punitive and exemplary damages, pre-judgment interest, post-judgment interest, costs, and other reasonable expenses incurred as a result of maintaining this action, including reasonable attorneys' fees and costs; and,

(e) All other relief provided by law and in equity to which Plaintiff is entitled and that this Honorable Court deems equitable, just, and proper to award Plaintiff for which this suit was brought.

PLAINTIFF REQUESTS A TRIAL BY JURY

Respectfully submitted,

PAUL JUBAS LAW                          MAX PETRUNYA, P.C.

/s/ Paul Jubas                          /s/ Max Petrunya
Paul R. Jubas, Esquire                  Max Petrunya, Esquire
Pa. ID No. 311832                       Pa. ID No. 309122
P.O. Box 10704                          5 Bayard Rd., Unit 917
Pittsburgh, PA 15203                    Pittsburgh, PA 15213
(412) 230-0023                          (412) 720-3497
pjubasesq@gmail.com                     maxpetrunyapc@gmail.com